No. 33,492

EFFIE BAGLEY POWELSON, *Appellee*, v. CENTRAL LIFE ASSURANCE SOCIETY (Mutual), *Appellant*.

(72 P. 2d 990)

Opinion filed November 6, 1937.

*Paul R. Nagle, William Davison*, both of St. John, *Fred P. Carr, A. R. Shepherd* and *George F. Malcolm*, all of Des Moines, Iowa, for the appellant.

*Robert Garvin, Evart Garvin, Morris Garvin*, all of St. John, and *Fred H. Aldrich*, of Detroit, Mich., for the appellee.

The opinion of the court was delivered by

SMITH, J.: This was an action on a life insurance policy. Judgment was for plaintiff. Defendant appeals.

On March 28, 1928, Ronald Powelson took a policy on his life, in the amount of $2,000, with the Illinois Life Insurance Company. Plaintiff, his mother, was named beneficiary. The premium was $7 quarterly. The last premium was paid September 28, 1932. On November 28, 1932, a notice of the next premium was sent insured. On the same date the company went into the hands of a receiver appointed by the United States district court. The insured paid no

more premiums. On May 19, 1933, insured died. On July 22, 1933, the receiver for the Illinois Life Insurance Company entered into a reinsurance contract with the defendant in this case. This reinsurance contract was approved by the United States district court on the above date. It will be noted that insured died between the date when the company went into the hands of a receiver and the date of the reinsurance contract.

When the company went into the hands of a receiver insured became a general creditor of the company and entitled to his pro rata dividend out of the assets on his claim as a creditor in the amount of the value of his policy as of November 28, 1932. This would have been the procedure had the receiver seen fit to liquidate the company. In order to preserve to each policyholder and creditor his right to a dividend, the decree approving the reinsurance contract provided for the determination of the cash liquidating value of the assets of the Illinois company as if sold at public sale. The reinsurance contract gave each policyholder and creditor a choice between the dividend which he would receive from a liquidation of the assets of the company and such rights as might be afforded him by the reinsurance contract. The fairness of this plan does not concern us here. Obviously some such plan must be worked out when an insurance company becomes insolvent in order to prevent the disastrous consequences of liquidation. Under the plan, had insured seen fit to take his pro rata share of the assets he would have received fifteen percent of the value of his policy on November 28, 1932. Plaintiff saw fit to choose instead of a liquidating dividend any rights available under the reinsurance contract. Her rights must be determined by that contract construed together with the policy.

The reinsurance contract provided that there should be a lien upon the net equity of the policies in the amount of seventy percent. The policy with which we are concerned contained what is referred to as an automatic extended insurance provision. This provision was to the effect that should the insured fail to pay any premium after premiums for three years had been paid, without any option having been exercised, the company would without any action on his part grant extended insurance according to a table included in the policy. This table showed in months and days the length of time which an insured would be entitled to, according to the age of the policy when he stopped paying premiums and the age of insured when the policy was issued.

The contention of plaintiff is that under the terms of the policy as modified by the reinsurance contract the policy had sufficient value to continue it in force until the death of the insured.

Fortunately, there is not much dispute about the essential facts. The parties stipulated that the net equity of the policy as of November 28, 1932, was $42.78. It will be remembered that according to the reinsurance contract this is the figure to which the lien of seventy percent should apply. The parties also stipulated that according to the extended insurance table in the policy the value for extended insurance would have amounted to $34.28, which would have been sufficient to purchase insurance for the face of the policy for the period of two years and four months from December 28, 1932.

At the trial an actuary for the company testified in its behalf. He testified as to an amount which he called a surrender charge. His testimony was that the surrender charge was the difference between the reserve provided by the policy, that is, in this case $42.78, and the value of the benefits granted in the policy, that is, in this case $34.28. Whether the company ascertains the surrender charge by taking the net equity and subtracting the reserve for extended insurance therefrom or finds the reserve value by taking the net equity and subtracting the surrender charge therefrom this record does not make plain. The actuary testified that one theory of the surrender charge was that the company should have a right to deduct from an amount payable to a policyholder an amount sufficient to enable the company to get a new one to take the place of the former policyholder, and that the other theory was that it costs money to get business on the books of an insurance company and that the company had a right in determining the value payable to a policyholder to deduct from the reserve the sum which it had paid to get the policyholder on the books in the first place. There are arguments pro and con in the briefs in this case as to the fairness of this charge in the instant case where the insured died before the reinsurance agreement was entered into. There are arguments pro and con in the briefs as to whether the policy in this case provided for any surrender charge at all. We have not found it necessary to decide either one of these perplexing questions. The reinsurance contract contains a paragraph dealing with the situation with which we are confronted. It is as follows:

"Any policy which shall have lapsed after November 28, 1932, and shall not have been reinstated shall be limited to the automatic provision contained

in such policy for such amount as at the time said policy lapsed the net equity of such policy less (a) any surrender charge provided for therein, and (b) the policy lien, will purchase and shall not be subject to the lien. In case of extended insurance it shall be for the face of the policy less (a) any policy indebtedness, and (b) less the policy lien."

Here is the way defendant says the above paragraph should be applied to this case:

| | |
|---|---:|
| Net equity | $42.78 |
| Seventy percent thereof | 30.00 |
| Interest on seventy percent of lien about which there is no dispute | .45 |
| Sum of two above items | 30.45 |
| Amount of extended insurance according to policy had company remained solvent | 34.28 |
| Difference between $34.28 and $30.45 | 3.83 |

The above amount would have been sufficient to keep the policy in force until April 1, 1933. Insured died May 19, 1933. Here is the way the trial court applied the provisions of the above paragraph:

| | |
|---|---:|
| Net equity | $42.78 |
| Insurance policy lien | 30.45 |
| Available for extended insurance | 12.33 |

or

| | |
|---|---:|
| Net equity | 42.78 |
| Less surrender charge | 8.50 |
| Leaves reserve paid for paid-up insurance | 34.28 |
| Seventy percent of $34.28 to nearest dollar | 24.00 |
| $34.28 less $24 leaves | 10.28 |

Either one of the above amounts would have kept the policy in effect long after the date of the death of insured. Much writing would not make this any clearer than the above. In order to uphold the calculations of the trial court it is not necessary to invoke the rule that an ambiguous provision in an insurance policy will be construed against the insurance company.

It will be noted that as the defendant interprets the above provision the seventy percent lien on the net equity should have been ascertained and instead of subtracting this amount from the net equity defendant argues that it should have been subtracted from the net equity less the surrender charge. The effect of this method of calculation is to make the plaintiff suffer the loss of seventy percent of the surrender charge twice—a result which we are unable to find is permitted by the language of the provision. The construction of the provision followed by the trial court is a fair one and commends itself to our judgment as the natural meaning of the language used.

The judgment of the trial court is affirmed.